We will hear argument next in No. 23-2098, Wherever TV v. Comcast. Mr. Sanders. Thank you, Your Honors. May it please the Court, my name is Adam Sanderson for the appellate Wherever TV. Time permitting, I hope to address four issues. The first three relate to Wherever TV's appeal of the District Court's judgment of non-infringement as a matter of law. The District Court determined that there was insufficient evidence as to two claim limitations, the IPG application and the adding channels. As to these two claim limitations, it's worth noting that the District Court judge assigned to the case was presiding over his first patent trial. You know, I once got into trouble making exactly that point from where you stand, and I would not advise you to go there. Yeah, okay, that's fine. Your Honor, these two claim limitations, the District Court erred. The District Court weighed Wherever TV's, did not view Wherever TV's evidence in the light most favorable to Wherever TV, and the District Court misconstrued the claims. The District Court imported limitations and did so at the JMOL stage. So I'll address those two limitations. And then third, I would like to address the alternative ground for affirmance that Comcast has raised relating to the distinct server limitation. Comcast's argument there is that if the Court had adopted Comcast's proposed construction for that limitation, there would have been a finding of non-infringement. But Comcast overlooks the fact that a previous judge held a two-day evidentiary hearing and took live expert testimony about how a person of ordinary skill would understand that construction, and it would not be a de novo review, and the evidence was overwhelming that Comcast's proposed construction was wrong. And then last, I hope to address Comcast's cross-appeal where they argue indefiniteness. The first limitation is the IPG application. The Court gave it its plain meaning, and... Let's assume that it does not, in fact, have a plain meaning. I think that's a vastly overused term, even when combined with plain and ordinary meaning. There are some pretty obvious challenges on both the adding point and on the IPG about how much of the intelligence in producing information has to be local. So just get to... Yes, I'll get right to it. How does spec or anything else helps us figure out the answer to that question? It does, Your Honor, and I think one of the errors that the district court is not focusing on what is being provided. The Interactive Programming Guide application, the claim one requires the application to provide an Interactive Programming Guide. The experts both testified that that's a graphical user interface. And it's not just graphics. It has to be interactive. So it has to respond to the user's inputs. And if you've used television the last 50 years, you're familiar with that. And that's in the specification. I would direct the Court to column two, line 59 through 62. Well-known graphical user interfaces. That's how... That is what an IPG is. Claim one also tells us to whom is the Interactive Programming Guide being provided. It's to the user. It's interactive by the user, and it's a user-configurable Interactive Programming Guide. What I'm hearing, but help me if this is your view, that essentially you think the IPG application, if construed, should be construed to require, but only require, the graphical user interface and that it's responsive to the user. It could do a bunch of other things, too, that are called out in the specification. But if it were construed as a matter of law, that's all... It only need consist of those couple things I listed. Is that your position? I think that's right, Your Honor. And that's because that's what an Interactive Programming Guide is. And it is interactive to the user. But where the real meat of claim one is, it's not just providing any Interactive Programming Guide. It's providing one with these particular features in claim one that make it different and special. So it's got to be an application that provides a graphical user interface that provides that access to both these different types of content sources, traditional cable and satellite, as well as these new modern streaming services. So what is your view, then, at their Rule 50 motion? What should the district court have done? Should it have provided the construction according to what you and I just set out and let the case go to the jury? Or should the judge have done something else? I think when the part... If it really comes down to the word provide, I don't think anyone, even the experts, disputed what an Interactive Programming Guide is. The question is whether it was, quote-unquote, provided by the XLA receiver application that we identified. The district court determined that it wasn't because there were programs in the cloud, according to the district court, that did, in the district court's mind, provide that Interactive Programming Guide. But that was error because the testimony from our side, as well, was that none of those programs in the cloud have any ability to provide not only graphics, but receive the inputs from the user. The district court, I believe, used the word brains. The brains, as far as the Interactive Programming Guide, is on the set-top box. It's in the form of the XLA receiver. So what should the court have done? Can I ask you some questions? Okay. When you say the brains, I mean, I think you're saying the word provides. I mean, I looked it up in a dictionary. It says it's make available for use, right? Yes. So the XR receiver, as I understand it, that renders the display, right? It creates, it makes, takes whatever information it gets, the instructions it gets on how to render. It might get that from the server, but it is the thing that makes the display show, right? It's like a graphics processor.  And it's also the thing, do I remember, I just want to make sure I understand this correctly, and then I'm going to let you talk, sorry, that the user also, it receives the user instructions, any user instruction, and will send it to the server? Yes. And your view is that that, although it's not doing the entire job of making an IPG, it's enough to meet the claim link, which just says that the application provides an IPG. Is that right? Yes, Your Honor, because, and it's the most logical choice. It receives every button press that the user provides through the keyboard is captured by this program, no other program. This program, if it can't process it itself, and most of the times it doesn't, it packages it up, it creates a network connection to an application that runs in the cloud, sends the event up, gets data back, and what Comcast's vocabulary is instructions, rendering instructions that come down from the cloud, but the testimony from our expert is that is a data file formatted in JSON, the only program capable in Comcast's X1 system. Can there be two interactive program guides in this claim? I mean, it's a comprising claim. There has to be an interactive program application installed on the device, right? But could there also be one elsewhere? Yes, Your Honor. That's yet, I believe, an error that the district court makes, if the district court believed that there is an application in the cloud that qualifies as an IPG application. Claim one only requires an IPG application that provides. That is not to say there can't be two, and I would submit to you that the application that most directly provides the interactive programming guide to the user is the XR receiver. The other applications in the cloud are providing data, not an interactive programming guide, but Comcast would argue that they do enough to be deemed that. Do they amount to an IPG application or a claim one? That's not mutually exclusive of the XR receiver being an IPG application. But is this a fact question? These are all fact questions. Okay. Your idea of provide is that if I have a little earpiece and you ask me a question, I don't have the slightest idea what the answer is, but I've got the earpiece and the network boss is now feeding me information and I present it to you, that's providing. And I do not mean to ask that in a skeptical way. I think that's what this amounts to.  I think this XR receiver does far more understanding than maybe that hypothetical you're giving. Because it's drawing, it's forming the words that are going to come out of my mouth and it's also listening through my ears to go back to somebody up north to get the information that will then be submitted to me and I will speak it. I would say it this way. If you've got a hearing piece and you're getting help from someone in another room and they're giving you information to respond back to me, I would say they're giving you data, but they don't know what the user in the living room is asking for. They don't know what's being asked. They don't know how to draw it, but you do. So you take that information and with your knowledge and your expertise, you're the only program that can now say I'm going to formulate that to an answer to this user. I don't know if that answers your question, but these are fact questions. And I'll just crystallize it with one point. One of the important fact findings the district court made, that was error, was determining, well, the set-top box doesn't provide the Interactive Programming Guide. It's provided in the cloud. I would ask your honors to consider Comcast's own document, Appendix 15889. And Comcast's own document says Parker is a set-top box that has been enhanced to provide the Excalibur Guide and core service functionality of Comcast customers. I don't understand why there's not a claim construction dispute, a question of law here, for instance, with your back-and-forth with Judge Serrano. Why shouldn't we do that as does provide include helps, partially provides, but doesn't completely provide? Isn't that a question of what the patent is claiming? I think that would be very helpful if we go back and we retry this case to get that construction. That provide doesn't mean it has to do everything itself. But then I'm concerned your argument in places seems to be it's too late to construe these claims, or at least it was at the first trial. Well, Comcast never proposed a construction for the word provide. And although we disputed many terms, I was not aware that was a dispute of that word until we got through the trial. And then after the close of evidence, that was the argument. I'm not saying they waived it. I'm not saying they didn't present it. We fought about a lot of cases. And you didn't present a construction either. And we never proposed a construction. So now at this point, if there were a construction to be provided, there has to be a new trial anyway, right? So there's no O2 micro problem, right? There's no. The jury's gone home already. The only way to go back is to do it over. And we would need that, I believe, some instruction. Because there's a dispute now, clearly, of what provide is. And I would submit respectfully that claim one already contemplates the idea that the IPG application doesn't do it all itself. Can I just switch topics? Yes, please do. So tell me if I've understood what is concretely in dispute. On the accused system, there's a set of icons that appear on the screen. And you don't get to add icons, you as a user, to the screen. But you do get to activate them. And so one question is, maybe even the only question, is whether without a further construction, the term adding can encompass a notion of activating, not creating a new item on the display. And I take it your position is the answer to that is yes. And therefore, without a construction, it was improper to grant JMO.  Okay. And if we were to say that, then the question would have to go back. And there, too, there would be a question, well, maybe there really ought to be a claim construction. And so you also want to persuade us that actually the concept of adding is in fact sufficiently broad that it's not limited to creating a new symbol on the screen, on the display, but in fact making it a door that is open to the transmission of content. Yes and yes. And to answer that question, I think maybe what was lost, the district court, is that the antecedent of channels is channels of video content. So the confusion I would submit is that the court confused the offering of a channel with an actual channel of video content. So the offering of a channel, all these content providers want consumers to know about their channels, want consumers to know about their video movies and television shows. So they're available to see the description, the titles of the movie, the channels through the gut. But aren't there aspects of the specification that suggest a distinction between adding a channel and subscribing to a channel? And if that's right, then why isn't the adding, as I think Comcast says, really about changing what's on the display? Yeah, there's nothing in the patent about changing the display. That's why Comcast's proposed construction wasn't right. The site and the specification I'm familiar with that I think you may be referring to talks about adding or deleting channels or subscribing to a program. So when they're talking about subscribing to a program, it's like a pay-per-view program. Whereas adding and deleting channels is a broader problem. But there's nothing in the spec about subscribing to Netflix? I would say there is in figure eight. So when Comcast moved for JMAL from the district court, they argued that figure eight is an illustration of how to add a channel. And we agree with that. Figure eight does provide a flowchart on how to add a channel. And the first step in the flowchart is you view the IPG. The second step is you select your content source. I would submit to you that's the offering of a channel, that's the offering of Netflix. And then from there, you've got a decision tree, left or right, depending on what the content source is and whether you have a subscription already. And if you don't have a subscription, you may have to subscribe. I would respectfully submit that sometimes our argument has been a little bit misstated. Subscribing is very often a step in adding a channel. But it is not required. You may already have a subscription relationship with Netflix. You've done it separately. So you may only need to provide your credentials to the system, so therefore the system knows. But you're right, you've activated that. So you just want to activate it. It's undisputed, right, that, I don't know, if Comcast doesn't have a showtime icon, that nothing you can do to put one on the screen. I can't. And does that matter? It's not the right analysis, but it matters because the district court sent the jury home in part based on that. So it's not the right analysis. I guess I'm thinking of a situation in which Comcast provides an icon, say Netflix, but it's as good as dead. It just doesn't do anything for you until you activate it. And then some other thing, showtime, if that still exists, where it's not even on the screen. There's nothing you can do about that. You can activate the first, but there's nothing you can do about showtime. The district court said at no point did Wearable TV prove that they could increase the number of channels that Comcast offers. But nothing in the claims requires us to increase new channels that Comcast offers. We don't have to do the IPG. That's what the district court said. Is it your view that both of those examples that Judge Sharada just said would be adding, it's just the claims aren't limited to only the showtime example? Yes. Yes. That would be my position. The claims don't, they would be adding. If I was to be able to literally force the IPG to offer a new icon of showtime, like you said, that would be adding. So that in your view, it meets the claim to be able to do one kind of adding, even if you can't do another kind of adding. Yes. And I think that would be most closely followed what you see in both Figure 7 and Figure 8, in that you are selecting a channel that's already listed as an available option to be offered, or the icon, as you say, and then you've activated it. That's what Figure 7 and Figure 8 show, is that it's a, yes, go ahead. I just wanted to ask you about the claim-claim language. So an antecedent to adding or deleting channels is that each of the channels is selectable. And so I'm wondering if that impacts your claim construction at all, because it is comprising claims. It says each of the channels is selectable, and then later it says adding or deleting channels. Is that only channels that can be selected? Yes. Yes, yes. So I would say I would start first with channels of video content. That's what we're talking about. That's the antecedent at the very top. And I would say the plain and ordinary meaning of adding channels is you don't have the channel until you can watch the channel. You don't have it. So if you want to come over to my house and watch the Super Bowl next week, and you ask me, do you have the ESPN because of the Super Bowl, and I say, I have it. What you're asking me is, can we select it and watch that Super Bowl? And you're going to be disappointed if you come over, and I say, there it is. There's the ESPN icon, and then I select it, and then you and I are seeing a message saying, you really need to add it and subscribe to it or call your operator. So I think the whole part of Claim 1 is directed to what you're saying. It's about channels of video content selectable for receiving video programming. And this is also consistent with computer science. Channel in general is just a data pathway over which data flows. A channel of video content is a pathway over which video flows. You don't have a channel unless you can actually get the programming on the channel. That's what I would say. Just real quick, you said Figure 8 is an embodiment of the claims. It's not the full scope of the claims, right? No, it does not define the claims, and neither does Figure 7. But they're illustrative. Thank you. If I could turn. . . I don't know if. . . What did you want to address? Their alternative ground for affirmance, which was a distinct server limitation. I think we should go to the other side. Thank you. Thank you. And we'll restore your rebuttal time plus. Thank you. Thank you, Your Honor. Robert Miles, lead for Comcast. I want to pick up on the adding or deleting discussion because I think there were some important comments made by counsel on the other side. In particular, I think it's quite clear based on the specifications or throughout the patent that adding means adding a new content source, not one that already appears in the guide. And on the flip side, deleting means deleting a content source that does appear in the guide and no longer appears in the guide. So, for example, Figure 3 illustrates adding a channel called Yuck's TV to the guide, some Internet channel that I'm not sure that exists anymore. But Yuck's TV, it talks about how a user who wants to add Yuck's TV to the guide can find Yuck's TV. It might not be available from Comcast, which is given as an example, or other providers. They can add Yuck's TV. They can have it appear in the guide, and they can assign it a channel number. And, again, this is part and parcel of what the entire patent is talking about when it's talking about adding. So, you know, in the description of the prior art, for example, it talks a lot about how the traditional model is where the MSO, the cable company, rather than the user is in control of what's available. Is there a particular language that you want to point us to in the specification that you're relying on for how you just described Figure 3? Yes, absolutely. So the description of Figure 3 comes, I think it's column 10, around line 30 to sort of 45. And so at 31, it talks about how the top row of that figure details the possible content available using the global IPG of the present invention. So that's the content that you can access using the invention. And then at 45, it gives the example of how, due to contractual limitations, a Monado Tokyo cable subscriber can't watch KABC because it's not offered by that cable company, Monado. And so the NA box, not available, appears. And then, this is now in column 11, the top of the column, line 5. It talks about adding Yuck's TV, and it talks about how in the present invention- Is it a comedy channel or something? Honestly, I don't know. But it's certainly a channel not available from cable providers, cable companies. And so in the present invention, it allows the user to add Yuck's TV and program it to appear at channel 900, and then it allows the user to add other content subscriptions. So again, this is talking about channels that are not available, and from the content providers, the cable companies. I totally get how that's an example of adding. I just don't see what limits the scope of adding to that type of example. What can you point us to? Yeah, absolutely. So I think, again, there are a number of places in the present invention, for example, discussion. And this is at column 6. It talks about how, and this is line 4, the invention allows content based on user-defined preferences, not content availability restrictions provided by a content provider. At 10, it says users are not limited to an MSO, a cable company or content middleman, who limits or controls what content is available. And then starting at line 16, we have an example that I think describes this case perfectly. It talks about how the user can add, delete programming channels in real time, so that's the claim language, adding and deleting, that might not be available to subscribe through MSOs. And it says, i.e., a user with a subscription to Time Warner Los Angeles and Comcast Philadelphia might not have access to CCTV5, but could subscribe with CCTV5 and integrate this channel into the IPG. So it uses the word add, which it was agreed below meant adding to the IPG. It uses add to refer to accessing a content source that wasn't already in the guide provided by the cable company. But doesn't it also say i.e., you know, as in, for example? So that may be one example, and I understand the argument from the other side that we're trying to import limitations from the specification into the claim. But the flip side of that is that they can't run away from throughout the specification. I can give more examples, too. He said figure 8 is an example of adding again. But even if so, the claims are generally not limited to the examples unless there's something that excludes the broader view that they would have. So I'm looking for what would tell me that one of skill and the art would not read the claim language as broadly as the patentee is argument for. So I understand the patentee's argument in this regard. It's that the word add or delete means subscribe or unsubscribe. It includes that. Right, and it includes subscribe or unsubscribe to channels that appear into the guide or activate or deactivate icons that already appear in the guide. And I think there are sort of two key problems with that. I think the first is that the rest of the claim language requires configuring the guide, so actually moving things around on the guide, changing the appearance of the guide in terms of which channels are ordered, the configuration. And I think subscribing and activating doesn't reconfigure. I don't know if you want me to stop you there. I had understood, at least in the accused system, and I know I was asking about claim construction. I'm sorry to jump from one to the other, but the configuration could be going from a gray sort of I can't access the content of the channel I see on the screen to now it looks black, so I can't access it. Wouldn't that qualify as configuring? I don't think it would, Your Honor, because configuring, and there are a few places where it comes up in the spec, refers to actually rearranging the appearance of the guide, the order of the channels in the guide, going back to the not providing. Even if this is, I don't think in dispute, this is not the way the district court got to a judgment on infringement. It's not an argument on appeal, I don't think. No, not at all. And sorry, I apologize for going down that road. I mean, it was agreed below that everyone understood that this meant adding to the guide, and that is what the way their expert described it. He said it was crystal clear that this means adding to the guide. This is how they framed their plain and ordinary mean claim construction. And so, again, if you're subbing in the words subscribe or activate. Do I remember? I thought that this was another limitation that was given plain and ordinary meaning. Am I wrong? No, that's correct, Your Honor, but at the Markman stage, wherever TV said that they asked for plain and ordinary meaning, which a skilled artisan would understand as adding or deleting to the guide. So just to illustrate that it was understood below, and the reason why there wasn't a conversation about configuring is because the question was, can you add to the guide or remove from the guide, which I think precludes this sort of subscribing, activating understanding. And then the spec itself, and a few of the figures, seven and eight, that we've been discussing actually distinguish between subscribing and adding. So in figure eight, for example, and I believe counsel said this, subscribing may be one step of the process to adding a channel, but it's not the entire channel. And, in fact, in figure eight, there are a number of additional steps that have to be taken. So at step 800, it talks about adding a new content source. 806, locating the new source. Then on the back end at 808 and 810, there's downloading the metadata. I'm sorry, I think I'm not quite getting the point you're trying to make with this. So what I was trying to respond to is. If subscribing is one part of adding, then going from a gray icon to a live icon by subscribing would seem to be included in adding. No, Your Honor. What I'm trying to clarify is that figure eight illustrates the full set of steps that have to be undertaken in order to add a channel. So merely subscribing to a channel that is already there isn't the way the figure in the specification describes the full flow of adding a channel to the guide. So adding is broader than and has a different meaning than subscribing and merely subscribing to a channel. So if Comcast, in my earlier hypothetical, on Tuesday doesn't have a Showtime icon and Comcast puts a Showtime icon on the screen on Wednesday, has Comcast added that channel even though it's dead? I think under the understanding of adding, yes. Comcast has added that channel to the guide. It didn't appear in the guide before and now it does. And we have the example of Netflix where that was the case before 2012. A user, no matter how badly they wanted Netflix, couldn't add Netflix to the Comcast guide. Then starting in 2016, Comcast added Netflix to the guide. And from there, a user couldn't delete it, which is sort of the other side of the adding or deleting limitation. No matter how badly they didn't want Netflix to appear in their guide, it still appeared there. Isn't this discussion reflective of the fact that here there is a material dispute as to the scope of adding and deleting in the claims and somebody needs to construe them as a matter of law? In the district court's view, which I think is correct, is that, in fact, the plain and ordinary meaning of the adding and deleting limitation doesn't stretch far enough to include the subscribing or activating understanding. To the extent there was a claim construction dispute, the district court could have resolved that before sending to the jury. I think the record's clear how the district court would have resolved it based on the reading of the patent that's in the district court's opinion. And it would have been a claim construction that excluded subscribing or activating for all of the reasons I've been giving. So I think it was right to just give the limitations their plain and ordinary meaning and find that the evidence didn't suffice. But I think it's ultimately immaterial if the district court had construed it and called it a construction rather than... The claim language says adding or deleting. So a system that didn't allow you to delete but did allow you to add could come within this. That's correct. Okay. And what is the status of any validity challenges to this claim? So we raised the indefinite issue on the cross deal. Put aside indefinite. There is another invalidity challenge we were raising at trial, which would still be open in a future retrial. A prior art challenge. Yeah. That wasn't resolved. I see. If I may, I want to switch to the IPG application installed on the website. And that was raised only as a defense? Yes. Okay. So in the colloquy with my friend on the other side, there's a lot of focus on the providing language. But the key language I think in the claim that we're disputing appears just before that, which is the claim language requires a very specific type of application to be installed on the device, an interactive program guide application that in turn provides user configurable IPG. And the meaning of interactive program guide application is an application that actually provides itself, the interactive program guide. In full with no assistance from anybody else. I think it may be able to provide with some assistance, but it has to perform the functionality itself of that type of application, an interactive program guide application. And how do we know what that functionality, the functionality of an IPG application is? And most importantly, how do we know it's not limited or it's not satisfied by just the few things that are done on your accused receiver? So there was no dispute below that the XRE receiver does only two things. It displays pixel by pixel information rendering instructions it receives from the server in the cloud. And it receives and transmits user input. Those two things do not constitute any of the functions described in figure four, for example. Which is exemplary and not the full scope of the claims. Agree. And it is true. But again, it would be surprising if not a single one of those functions were performed by something that is an IPG application. And again, I think throughout the patent from the title on down, it's talking about what an IPG application is and does. Can I ask you a question? Yeah. Is there any place in the patent that talks about the importance of an IPG application that does all of these things that you're saying the IPG application does, being in a particular location or being a single application? Yes, Your Honor. I think, so in a number of places, for example, at column seven, line 29, it's talking about an always-connected portable set-top box. And that's where wherever TV gets its name. The purpose was to have a self-contained set-top box that would itself have the IPG application installed on the device and you could move from place to place. As distinct from- Did you say column seven, line 29? I believe that's right. I'm sorry, but what is that? Why would that portability, mobility function, which the spec does talk about, not be satisfied by a box that performs these very limited functions of creating a display and listening to the user, but sending and receiving everything of importance up to a server? And since the server is going to be separate from the Shanghai cable company, all of this can be done. It's just that your box is enabling you to communicate with all of these functions in figure four, I guess, which are up in the cloud. In that scenario, you would have an application on the device that assists in providing or plays a role or connects to something that it's providing, but it would not be an IPG application itself because the application on the device is not performing any of the functions that you just described as being- What about the function of rendering the display? And I think everybody would have to agree that there's not going to be any user configuration without at least the XR receiver sending what the user input was to this XR server, right? So that's true, but the claim only requires an IPG on the device. So whether or not the IPG that Comcast has in the cloud is alone sufficient to provide the entire- I understand. You're assuming an IPG application has to do more than the two functions I just identified. That's right. Okay. Going back to my question before where I asked you, if anywhere in your specification does it say that it's very important for an IPG application to be in one place or that there be one application that does it all with respect to the IPG? And you pointed out the language portable set-top box. Is there anything else? Absolutely. So another place I'd go is in the summary of invention at column eight. I believe it's around line 31, and it talks about how metadata related to the remotely stored content is transferred to and locally stored in the device in the form of the global IPG customized to the user's individual preferences. And then figure four, which is illustrative, but again indicative of what the meaning of the term is in the claim. So the description says figure four is a conceptual architectural diagram of the global IPG application. So it is describing a set of functions that the global IPG application performs. Can I take you back to the first of your examples, just since it was first, which was column seven, lines 29 to 30, which says the present invention allows for an always connected portable set-top box regardless of internet service provider or MSO. That's what you were referring us to, right?  What about that is telling one a skill in the art that it's important how much of the IPG application functions are stored locally in that set-top box as opposed to out in the cloud when, after all, it's talking about being always connected to the cloud, to the internet? So what that's talking about there is the connection to the MSO is for the provision of the content itself. Earlier in the specification, it talks about how the MSO is not in control of the guide and the user is in control of the guide. So that connection, by the terms of the specification, describes the role of the global IPG of the invention. That connection is not providing the functionality of the guide that resides on the set-top box precisely because the purpose was to sever the tie from the IPG application provided by an MSO or cable company like Comcast. Then, I guess, help me out. What part of 29 and 30 is responsive to Judge Stoll's question about show us where it's important or where the patent says it's important to have these things on the set-top box as opposed to elsewhere? So the portability of the set-top box in that example hinges on the fact that the IPG resides on the set-top box because the connection to the MSO or cable company is not providing the global IPG itself. So in order to have a set-top box that is portable in the way that they are describing it in that portion of the specification, the application itself has to reside on the set-top box itself and can't be coming from a source that's not. It doesn't say that, though, right? There's some inference being made there, right? Absolutely. I don't know, because it does say always connected to Judge Stark's point. Because if it's always connected, it really doesn't matter whether the IPG is on the set-top box or not, right? In order for the set-top box to be portable. I think it does matter because it's important to the patent who is providing the interactive program guide application. And where do you get that from? So in the description of the present invention, it talks about how in column six, line four, it allows the user to access and view the same content through an identical IPG anywhere in the world. But that's not, that's just saying, I think, tell me if I'm wrong, but I read that when it says identical IPG as being the display itself. You know, that it's always going to have the same content. Whether I decide that I want to look at my IPG and watch the game here at court, or whether I want to do it at home, I'm going to get the same IPG. So how does that tell me that it's important that the IPG app be on the set-top box? I mean, all functionality of it. So, again, I think it's the connection between the requirement from the claim of the IPG application installed on the device and the severing from the content availability restrictions provided by the content provider consolidator. And, again, in the description of the prior art, it talks about the IPG being provided by the MSO and this allowing sort of a user-provided and controlled MSO. Something has to be on the box, and the only thing that was shown at trial was the renderer and the sort of passing of the instructions on the box. And that's quite far away from the plain and ordinary meaning, I think, of what an interactive program guide application. In much the same way that an external computer monitor performs that same function. And there's testimony, I think, from both two experts, one saying that an IPG application has to perform all of these functions and one saying it's sufficient that it only perform two, right? So there was no dispute about the two functions it performed. I'm just asking, is there contrary expert testimony on this point? That is, the plain and ordinary meaning of what an IPG application is. I don't believe there's sort of specifically on this issue. There is talk in the argument before the judge on the Rule 50A motion about talking about the functions that the IPG application needs to perform and discussion of Figure 4 and then Figure 7 and 8 as well. I don't think there's any expert testimony. I'm not sure that there's expert testimony going to this particular issue. The particular issue being the meaning of an IPG application. That's exactly right. I mean, there's conflicting testimony with respect to whether the limitation was satisfied, but I don't think there's anything specific talking about what an IPG application needs to be. But there is specific expert testimony from their expert that your device, your receiver, has an IPG application within the scope of their understanding of the claim. Yes, but again, I think that conflicts the sort of shared understanding of the function it did in light of the meaning of the plain and ordinary meaning. You're across the field. I'm just wondering, is it contingent, or do we need to reach it even if we agree with the judgment of non-infringement? No. If the court affirms on the non-infringement grounds, you don't need to address the cross-field. I'm happy to answer any questions about the cross-field. I think that's good. Thank you. May it please the Court. Your Honor, I would disagree that at the trial there was an agreement between the experts that the XR receiver only does two things. There was actually evidence from wherever TV's expert that XR receiver does some of the things that are in the embodiment in Figure 4. It's not required. Figure 4 doesn't define the invention. And I would just ask the Court to consider one of the functions of the Figure 4 is then content retrieval and viewing management. I would ask the Court to consider at Appendix 13942. Can you say that number again, please? Yes, Your Honor. Appendix 13942. I would also ask the Court to consider for the feature in Figure 4 labeled content organization management, the testimony from Dr. Easton that you can find at Appendix 13957-58. There, Dr. Easton testified that the XR receiver allows the user to organize the content by labeling channels as favorites or putting in parental codes, which nicely falls in within that feature of Figure 4. And there is more. I'm sorry, that one would be 306? I'm sorry. Yes, that would be 306, Your Honor. Yes. And I would say 314 is device settings management. I would direct the Court to consider Appendix 18869, which is a one-page document that shows how the XR receiver can control the network connections to these other devices in the cloud. So there was more evidence than just the XR receiver does two things. And did your expert say something in front of the jury about what his understanding of an IPG application within the meaning of the claims is? Where could we find that? What's in my brief. It's in our brief, what he said on that topic. And what he said there is, does Comcast X1 include an IPG application on the set-top box that does these things? He said, yes, it's XR receiver. And then he proceeded to explain, but the sites are in my brief. As far as does the IPG application have to exist as a self-contained program on a particular device and do everything? It doesn't. And I would ask the Court to consider the embodiment that is Figure 2A in the patent. And when you see that embodiment, you'll see that there's actually a distributed version of the IPG application. I thought, as I looked at that figure, one of those elements, the one that's not in what appears to be a cell phone, it's like set-top box 157 or 158 or something like that. I thought that that is described in the patent specification simply as being something that receives the video programming. Nowhere does it say that it's responsible for generating an IPG. But if I'm wrong about that, please tell me where in the specification it says that that element does something for the IPG. I'll tell you what I was going to ask you to consider. It's in column 9, line 30 to 33. In that line, in that part of the spec, it says, in this embodiment, the global IPG-12 located on the MMAD-14, which is one device, communicates with a segment of the global IPG code 154 located on a television operating system motherboard. My only point being that what they've got there is an IPG application that has been distributed on two different devices, and they're in communication with one another. I don't believe it goes further to talk about what features exist on one versus the other, except to then specify and say, in this embodiment, the video content, the movies, the television shows, are not passing through the device, the MMAD-14. Instead, in that situation, the MMAD-14 is orchestrating the delivery of the video directly from the content providers to the television for network bottleneck issues or optimization issues. Can I just ask one question? If you look right near the top of column 6, this is the present invention allows a user to access and view the same content through an identical IPG anywhere in the world. Internet connection is available based on user-defined preferences, not content availability restrictions provided by a content provider or consolidator such as an MSO. One thing you could say is that's not restrictive of the claim language, but I'm curious. When the server, a separate machine, from the head-end content machine, is owned and run by the head-end content machine owner, by the cable system, this sentence would not be true, right? So a Comcast-owned and run server with an IPG would, in fact, be restricted to whatever content Comcast chooses to put on that. I'm not sure I understand the question, and it's probably my fault. Could you repeat it again? I'm sorry. If you want Showtime and your own format, you can't get it from Comcast, right? So this sentence would not apply. As I say, if there was a discussion, maybe this is not restrictive, but is it right that this would not apply in the case of... You're talking about the sentence that says... The first sentence, yes, from line 4 to line 13. The present invention allows the user to access and view the same content through an identical IPG anywhere in the world, and internet connection is available and is based on user-defined preferences, not content availability restrictions provided by a content provider or consolidator such as MSO. Right, if Comcast won't let you put Showtime on and won't let you fiddle with the organization, then that sentence is not true. Yeah, if Comcast had designed their platform differently and didn't allow you to access other content from other content providers through their servers, then that sentence wouldn't be true. It doesn't restrict the invention.  Yeah. Yeah, and I think that's one of the arguments is... And you are out of time, so anything you need to submit better be new. I think I'm done. Thank you for your time. Thank you very much. Thanks to all counsel. The case is submitted, and that completes our business for the day, so we will stand at ease.